# LORAIN COUNTY COURT OF COMMON PLEAS
## LORAIN COUNTY JUSTICE CENTER
### 225 COURT STREET
### ELYRIA, OHIO  44035

RCK INVESTMENT LLC
PO BOX 546
VERMILION, OH  44089

CASE NO. 25CV215431

VS.

TO:   SCOTT  KRONE
      631 LAKE AVE
      WILMETTE, IL  60091

# S U M M O N S   O N   C O M P L A I N T

You have been named defendant in a complaint filed in Lorain County Court of Common Pleas by plaintiff(s):

RCK INVESTMENT LLC
PO BOX 546
VERMILION, OH  44089

A copy of the complaint is attached hereto. The name and address of the plaintiff's attorney is:

ANDREW G FIORELLA
BENESH,FRIEDLANDER,COPLAN&ARONOFF LLP
200 PUBLIC SQUARE, SUITE 2300
CLEVELAND, OH  44114

You are hereby summoned and required to serve a copy of your answer to the complaint upon the plaintiff's attorney, or upon the plaintiff, if he has no attorney of record, within **TWENTY-EIGHT (28) DAYS** after service of this summons on you, exclusive of the day you receive it.   Your answer must **ALSO** be filed with this Court within three (3) days after you serve, (delivered or by mail), a copy of your answer on the plaintiff's attorney.

If you fail to appear and defend, judgment by default will be rendered against you for the relief demanded in the complaint.

**TOM ORLANDO**
**CLERK OF COURTS OF COMMON PLEAS**
**LORAIN COUNTY, OHIO**

**2/21/2025**

BY: _____

**Deputy Clerk**



FILED
LORAIN COUNTY

## IN THE COURT OF COMMON PLEAS
## LORAIN COUNTY, OHIO

2025 FEB 18  P 2: 24

COURT OF COMMON PLEAS
TOM ORLANDO

**RCK INVESTMENTS, LLC**
P.O. Box 546
Vermillion, Ohio 44089

        Plaintiff,

    v.

**SCOTT KRONE**
631 Lake Avenue
Wilmette, Illinois 60091

    –and–

**JAMES LEHMANN**
5356 W. Warwick Avenue
Chicago, Illinois 60634

    –and–

**CODA DESIGN + BUILD, LLC**
600 Waukegan Road, Suite 129
Northbrook, Illinois 60062

    c/o Jeffrey M. Galkin
    180 N. La Salle Street, Suite 2750
    Chicago, Illinois 60601

    –and–

**CODA MANAGEMENT GROUP** *f/k/a*
    **SSSK CAPITAL FUND, LTD.**
600 Waukegan Road, Suite 129
Northbrook, Illinois 60062

    c/o Jeffrey M. Galkin
    180 N. La Salle Street, Suite 2750
    Chicago, Illinois 60601

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.** 25CV215431

**JUDGE** JUDGE DONNA FREEMAN

**COMPLAINT FOR DECLARATORY RELIEF**

RCK Investments, LLC ("RCK" or "Plaintiff"), for its Complaint against Scott Krone ("Krone"), James Lehmann ("Lehmann"), CODA DESIGN + BUILD, LLC ("CODA Design + Build"), and Coda Management Group *f/k/a* SSSK Capital Fund, Ltd. ("Coda Management," and together with Krone, Lehmann, and CODA Design + Build, "Defendants"), states as follows:

## INTRODUCTION AND NATURE OF CLAIMS

1.    As will be established in an ongoing arbitration between RCK and CODA HOLDING-V LLC, CODA HOLDING-V LLC breached the Development Contract, a true and accurate copy of which is attached as **EXHIBIT A**, with the material involvement of Defendants. As the alter egos of CODA HOLDING-V LLC, the Defendants are liable for that breach, as well as for CODA HOLDING-V LLC's breaches of fiduciary duty owed to Journal Storage, LLC and its majority owner, RCK.

2.    Krone and Lehmann executed the Development Contract on CODA HOLDING-V LLC's behalf. (*See* Ex. A, signature page.)

3.    In February 2021, Rodney Davis and Christopher Russo—the managers of RCK, a closely held limited liability company—purchased the former Lorain Journal Morning Newspaper property located at 1657 Broadway Avenue, Lorain, Ohio (the "Lorain Journal Property") through an entity known as Vermillion Shores, LLC.

4.    In March 2022, Vermillion Shores, LLC transferred the Lorain Journal Property to RCK, who intended to convert one of the buildings on the Lorain Journal Property into an indoor storage facility.

5.    Shortly after commencing development of the Lorain Journal Property, Davis and Russo were introduced to Krone and Lehmann, the managing members of CODA Design + Build, CODA HOLDING-V, LLC, and Coda Management, who also manage a chain of indoor storage

facilities known as One Stop Storage.  The parties began to discuss jointly developing an indoor storage facility on the Lorain Journal Property to later sell.

6.      On or about July 11, 2022, RCK and CODA HOLDING-V, LLC entered into the Development Contract outlining the parties' obligations related to developing the Lorain Journal Property (the "Project").  In the Development Contract, Journal Storage agreed to purchase a portion of the Lorain Journal Property, described as Tract "A" ("Tract A"), for $1,025,000.00.

7.      CODA HOLDING-V, LLC, based on its prior experience developing and building indoor storage facilities, was obligated to construct, design, and managing the indoor self-storage facility on Tract A.

8.      On or about December 19, 2022, RCK and CODA HOLDING-V, LLC formed Journal Storage, LLC, ("Journal Storage") for the purpose of developing, operating, and managing a self-storage facility on Tract A.  RCK and CODA HOLDING-V, LLC executed the Operating Agreement—a true and accurate copy of the Operating Agreement is attached as **EXHIBIT B.** Under the Operating Agreement, RCK owns 81% of Journal Storage and CODA HOLDING-V, LLC owns 19%.

9.      Krone and Lehmann executed the Operating Agreement on CODA HOLDING-V, LLC's behalf.  (*See* Ex. B, signature page.)

10.     While RCK has performed under both the Development Contract and the Operating Agreement, CODA HOLDING-V, LLC has not.  Following the execution of the Development Contract, Defendants assumed responsibility for managing the construction and design of the Project. On or about June 5, 2023, Journal Storage recorded a Notice of Commencement with the Lorain County Recorder's office, indicating that work on the Project had begun and naming CODA Design + Build as the original contractor.

- 3 -

11.     By January 2024, CODA HOLDING-V, LLC had drawn down nearly the entirety of the construction budget agreed to in the Development Contract, despite significant work remaining on the Project. On or about January 26, 2024, CODA HOLDING-V, LLC informed RCK it refused to make additional capital contributions to fund the remainder of the Project, thus breaching the Development Contract and the Operating Agreement.

12.     Additionally, CODA HOLDING-V, LLC has not performed its work on the Project in compliance with the development plans and approved blueprints, nor has CODA HOLDING-V, LLC submitted change orders to Journal Storage memorializing alterations to its scope of work, cost, or schedule. Instead, CODA HOLDING-V, LLC has completed substandard work and has failed to remedy its deficient work, and it has even damaged the property, including, but not limited to, by destroying the elevator system.

13.     CODA HOLDING-V, LLC has failed to perform under the Development Contract and the Operating Agreement. Specifically, CODA HOLDING-V, LLC materially breached the Development Contract by, among other things, failing to construct the indoor storage facility in accordance with the development plans and the approved blueprints, failing to return excess compensation for supervision fees, overhead, and profit, and failing to perform the remaining scope of work.

14.     On or about December 13, 2024, the Office of the Illinois Secretary of State involuntarily dissolved CODA HOLDING-V LLC. A true and accurate copy of the Office of the Illinois Secretary of State's website is attached as **EXHIBIT C.**

15.     As required by the parties' agreements, RCK is currently engaged in an arbitration with CODA HOLDING-V LLC. But because CODA HOLDING-V LLC has been administratively dissolved, RCK has reason to believe that CODA HOLDING-V LLC is insolvent

or in the zone of insolvency. Further, the Defendants have commingled funds belonging to CODA HOLDING-V LLC and otherwise abused its corporate form, as specified herein. For these reasons, RCK brings the following action to hold the Defendants liable for CODA HOLDING-V LLC's obligations, which CODA HOLDING-V LLC will likely not be able to satisfy.

## PARTIES, JURISDICTION, AND VENUE

16. Plaintiff RCK Investments, LLC, is an Ohio limited liability company with a mailing address at PO Box 546, Vermilion, Ohio 44089. Davis and Russo are the sole members of RCK. Since 2022, RCK has owned 81% of Journal Storage.

17. Defendant Scott Krone is an Illinois citizen with a mailing address at 631 Lake Avenue, Wilmette, Illinois 60091. Upon information and belief, Krone is a managing member of CODA.

18. Defendant James Lehmann is an Illinois citizen with a mailing address at 5636 W. Warwick Ave., Chicago, Illinois 60634. Upon information and belief, Lehmann is a managing member of CODA.

19. Defendant CODA Design + Build, LLC is an Illinois limited liability company located at 600 Waukegan Road, Suite 129, Northbrook, Illinois 60062. On information and belief, Krone, Lehmann, and SBS Private Equity Fund are the managing members of CODA Design + Build.

20. Defendant Coda Management Group *f/k/a* SSSK Capital Fund, Ltd. is an Illinois corporation with a last known address at 600 Waukegan Road, Suite 129, Northbrook, Illinois 60062.

21. The Lorain Journal Property, located at 1657 Broadway Avenue, Lorain, Ohio, is the subject of this action. The Lorain Journal Property is within the jurisdiction of this Court.

22.     The Court possesses jurisdiction over Defendants pursuant to R.C. § 2307.382(A) and Civ.R. 4.3(A).

23.     The Court possesses jurisdiction over the subject matter of this action pursuant to R.C. § 2305.01.

24.     Venue is proper in this Court pursuant to Civ.R. 3(C)(3), (5), and (6).

25.     The parties' written agreements at issue in this matter state that Ohio law governs.

26.     The Operating Agreement contained a governing law provision, which provides as follows:

> 17.6  **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

(Ex. B, ¶ 17.6.)

27.     The Development Contract also contains a provision stating that the agreement is construed under Ohio law:

> 7.     **VENUE:**     It is understood by the parties that this agreement shall be construed pursuant to the laws of the State of Ohio.

(Ex. A, ¶ 7.)

## FACTUAL ALLEGATIONS

### I.     Defendants are Alter Egos of CODA HOLDING-V, LLC.

28.     For all material, relevant purposes, Defendants—Scott Krone, James Lehman, CODA Design + Build, LLC, and Coda Management Group—functioned as an extension of CODA HOLDING-V, LLC.  Specifically, they share the same address; the same owners, members, officers, and/or trustees; the same funds and accounts; and the same debts and assets.

29.     Krone and Lehmann exert control over the daily affairs of CODA HOLDING-V, LLC, CODA Design + Build, and Coda Management.

30.     Krone and Lehmann operate Coda Management as if it is the parent company of CODA HOLDING-V, LLC and CODA Design + Build.

31.     Krone and Lehmann disregard corporate formalities, commingle funds, and otherwise cause CODA HOLDING-V, LLC, CODA Design + Build, and Coda Management to depend on each other financially and to give it no independent will of its own.

## II.     RCK and CODA Form Journal Storage to Facilitate Development of an Indoor Self-Storage Facility at the Lorain Journal Property.

32.     Davis and Russo have been managing members of RCK since 2012.

33.     In early 2021, Davis and Russo became interested in purchasing the former Lorain Journal Property through RCK and converting one of the two buildings on the Lorain Journal Property into an indoor self-storage facility.

34.     In February 2021, Davis and Russo—through an entity known as Vermillion Shores, LLC—purchased the Lorain Journal Property. In March 2022, Vermillion Shores LLC transferred ownership of the Lorain Journal Property to RCK.

35.     Shortly thereafter, RCK began to work on a development plan for the Lorain Journal Property.

36.     After beginning the development plan, Davis and Russo were introduced to Lehmann and Krone, the principals of One Stop Storage, CODA HOLDING-V, LLC, CODA Design + Build, and Coda Management Group.

37.     Together, the parties discussed developing the Lorain Journal Property into an indoor storage facility that could be later sold as a package with other One Stop Storage facilities.

38.     The concept culminated in Lehmann and Krone's entity, CODA HOLDING-V, LLC —which had design, build out, and construction management experience—entering into a Development Contract with RCK. Per the Development Contract, RCK and CODA HOLDING-V,

LLC agreed to form a limited liability corporation owned 81% by RCK and 19% by CODA HOLDING-V, LLC. Krone and Lehmann executed the Development Contract on CODA HOLDING-V, LLC's behalf. (*See* Ex. A, signature page.)

39. RCK and CODA HOLDING-V, LLC entered into an Operating Agreement for Journal Storage on December 19, 2022. (*See* Ex. B.) Krone and Lehmann executed the Operating Agreement on CODA HOLDING-V, LLC's behalf. (*See id.*, signature page.)

40. As part of the Development Contract, RCK and CODA HOLDING-V, LLC agreed to purchase Tract A of the Journal Storage Property for $1,025,000.00. (*See* Ex. A., § 2.)

41. Under the Development Contract, RCK and CODA HOLDING-V, LLC agreed to obtain bank financing in the amount of $3,225,000.00 for the purchase of Tract A and development of the indoor storage facility. (*Id.* at § 3.A.) The principals of RCK and CODA HOLDING-V, LLC, namely Krone and Lehmann, agreed to take out the loan in their own name to secure the financing. (*Id.*)

42. The Development Contract also set forth a $1,755,250.00 construction budget for the Project with an additional contingency of $93,700.00. Per the budget, CODA HOLDING-V, LLC was to be paid 10% of the final construction costs for construction management services, or $175,525.00, and 10% of the final construction costs for overhead and profit, or $175,525.00. (*Id.* at § 3.B.)

43. In the event of a budget overrun, RCK and CODA HOLDING-V, LLC agreed that CODA HOLDING-V, LLC was to pay the first 5% of any budget overrun, up to $87,762.50. (*Id.*) In the event that budget overruns exceeded $87,762.50, RCK and CODA HOLDING-V, LLC were to split all payments equally. (*Id.*)

- 8 -

44.    Finally, CODA HOLDING-V, LLC and RCK agreed that CODA HOLDING-V, LLC would not be compensated for any construction overruns exceeding the $1,755,250.00 budget. (*Id.*)

45.    The Operating Agreement of Journal Storage obligated members RCK and CODA HOLDING-V, LLC to, among other things, manage Journal Storage by borrowing money to finance the Company's activities and develop the property. (*See* Ex. B., §§ 9.1.3, 9.1.5.)

**III.    CODA HOLDING-V, LLC Fails to Develop the Property and Refuses to Comply with the Development Agreement Unless It Receives Additional Compensation.**

46.    CODA HOLDING-V, LLC has not adhered to the construction budget it agreed to at the inception of the Project.  For instance, CODA HOLDING-V, LLC has spent almost $200,000.00 on demolition, almost three times the original budget of $70,000.00. Specifically, CODA HOLDING-V, LLC:   (i) spent more money without informing RCK; (ii) over-demoed certain areas, such as the staircase and the office; and (iii) under-demoed other areas, such as the garage door, the man door, and the radiators, for which the blueprints expressly required removal.

47.    On January 26, 2024, after the original construction loan was almost completely drawn down, Krone sent an email allegedly on behalf of CODA HOLDING-V, LLC refusing to make additional capital contributions.

48.    Instead, CODA HOLDING-V, LLC requested reimbursement for all cash expenditures it had previously contributed.  Despite agreeing to obtain bank financing for $3,225,000.00 for the purchase and development of the Project and agreeing that Krone and Lehmann would take out the bank loan in their own names, CODA HOLDING-V, LLC has now breached the Development Contract *and* the loan agreement with the bank, because it has stopped paying its proportionate share of the loan.

- 9 -

49.     CODA HOLDING-V, LLC has refused to perform on the Project since January of 2024 and, on information and belief, has failed to pay its subcontractors, resulting in a mechanic's lien being placed on the Property.

50.     To date, CODA HOLDING-V, LLC has received—and retained—at least $363,751.00 in developer fees, and potentially even more, significantly more than the amounts provided for in the Development Contract.

51.     Tellingly, CODA HOLDING-V, LLC paid CODA Design + Build over $328,244.39 for CODA Design + Build's work on the Project. This direct benefit to CODA Design + Build is in contravention of the Development Contract and was not contemplated by RCK when it signed the Development Contract or Operating Agreement.

52.     Krone and Lehmann orchestrated these improper payments to CODA Design + Build, demonstrating their complete dominion and control over all the CODA constellation of entities.

53.     Throughout the course of the Project, subcontractors invoiced Lehmann directly for their work on the Project. By being listed as the payor for work done on the Project, Lehmann was playing fast and loose with CODA's entity structure.

54.     Further, throughout the course of the Project, Krone's and Lehmann's signature blocks stated that they worked for three entities: CODA DB [Design + Build], CODA MG [Management Group], and One Stop Self Storage—but *not* CODA HOLDING-V, LLC.

55.     CODA HOLDING-V, LLC has also failed to complete the Project in compliance with the development plans and approved blueprints. Among other deficiencies, CODA HOLDING-V, LLC failed to properly demolish sections of the pre-existing structure on Tract A, construct the fence included in the development plan, or level the second floor of the new structure.

In further contravention of the plans and blueprints, CODA HOLDING-V, LLC enclosed a stairwell on the Project that was not enclosed on the plans, resulting in additional work to remedy CODA HOLDING-V, LLC's mistake.

56. Despite RCK and Journal Storage's repeated requests, CODA HOLDING-V, LLC has not provided an adequate explanation for its deficiencies and deficient performance on the Project. RCK and Journal Storage have requested no less than six times in writing for the original contracts and contact information for each subcontractor working on the project and CODA HOLDING-V, LLC has never responded.

57. CODA HOLDING-V, LLC has also failed to contribute its portion of the loan repayment (despite Krone and Lehmann being two of the named borrowers under the loan), insurance, utilities, and property taxes, which RCK has had to advance on its behalf.

## COUNT ONE:
## DECLARATORY JUDGMENT
## (BREACH OF DEVELOPMENT CONTRACT)

58. RCK incorporates by reference its foregoing allegations and averments stated above as if fully rewritten herein.

59. A real, actual, immediate, and justiciable controversy exists between RCK, on the one hand, and Defendants, on the other hand, because RCK's rights, status, or other legal relations are affected, and the declaratory relief sought herein will effectively adjudicate the rights and obligations of the parties.

60. The dispute concerns RCK's Development Contract with CODA HOLDING-V LLC, which CODA HOLDING-V LLC has breached, and which is the subject of a pending arbitration.

61. The Development Contract is a valid, binding, and fully integrated contract between RCK and CODA HOLDING-V LLC.

- 11 -

62.    RCK has performed all of its duties and fulfilled all of its obligations under the Development Contract.

63.    CODA HOLDING-V LLC has breached its promises under the Development Contract by not completing construction of the Project in accordance with the Development Contract.

64.    CODA Design + Build has been acting as CODA HOLDING-V LLC's agent on the Project in direct contravention of the Development Contract. Despite the Development Contract obligating CODA HOLDING-V LLC to perform construction management for the Project, CODA HOLDING-V LLC allowed CODA Design + Build to perform CODA HOLDING-V LLC's construction management duties on the Project.

65.    Krone and Lehmann, under Coda Management Group, exerted their control over CODA HOLDING-V LLC and CODA Design + Build to orchestrate the flow of funds relating to the Project and to ensure that they received the most money possible from the Project.

66.    Further, for the construction completed on the Project, CODA HOLDING-V LLC has failed to perform in accordance with the plans and specifications for the Project.

67.    CODA HOLDING-V LLC has received in excess of $400,000.00 of supervision fees, overhead, and profit in contravention of the Development Contract, which states that CODA HOLDING-V, LLC "shall not receive any compensation for construction and design or construction management for any amounts that exceed the budget of $1,755,250.00." (Ex. A., § 3.B.) CODA HOLDING-V LLC refuses to disgorge itself of these overpayments.

68.    CODA HOLDING-V LLC has paid CODA Design + Build $328,244.39 for its work on the Project.

69. Despite the construction loan being completely drawn down, CODA HOLDING-V LLC refused to contribute additional capital to the Project. Per the Development Contract, RCK and CODA HOLDING-V LLC agreed that CODA HOLDING-V LLC would pay the first 5% of any budget overrun, up to $87,762.50. (*Id.*) RCK and CODA HOLDING-V LLC would then equally pay any budget overruns exceeding $87,762.50. (*Id.*) CODA HOLDING-V LLC has not paid any budget overruns, which exceed $300,000.00 in construction costs alone.

70. CODA HOLDING-V LLC has also failed to contribute its portion of the loan repayment, insurance, utilities, and property taxes, which RCK has advanced on CODA HOLDING-V LLC's behalf.

71. CODA HOLDING-V LLC's failure to complete the Project has further resulted in lost revenue, as Journal Storage is now unable to lease-up or sell the storage facility as originally intended.

72. As a direct and proximate cause of CODA HOLDING-V LLC's breach of the Development Contract, RCK has suffered substantial damages, including consequential and expectancy damages, in an amount to be determined at the arbitration between those parties.

73. At RCK's expense, the Defendants have exercised complete domination and control of CODA HOLDING-V LLC.

74. Based upon the sequence of events described above, CODA HOLDING-V LLC's financial condition has declined dramatically, to the point where it has been administratively dissolved by the Illinois Secretary of State.

75. Upon information and belief, including inferences that arise from the radical deterioration of CODA HOLDING-V LLC's financial condition during the pendency of the Project, the Defendants ignored corporate formalities, undercapitalized CODA HOLDING-V

LLC, used CODA HOLDING-V LLC as a façade, controlled CODA HOLDING-V LLC's critical business decisions, and/or otherwise abused the corporate form, and prevented CODA HOLDING-V LLC from performing under the Agreement.

76. The Defendants have abused CODA HOLDING-V LLC's corporate form in a manner that was unfair, fraudulent, and works an injustice on RCK.

77. Among other things, assuming RCK prevails on its claims in the related arbitration against CODA HOLDING-V LLC, RCK may be left with an uncollectible debt against CODA HOLDING-V LLC due to Defendants' mismanagement.

78. Accordingly, RCK seeks a declaration that Defendants are alter egos of CODA HOLDING-V LLC and thus are individually and personally liable for CODA HOLDING V LLC's breach of the Development Contract.

79. Because CODA Design + Build, Coda Management Group, Krone, and Lehmann are alter egos of CODA HOLDING-V LLC, CODA HOLDING-V, LLC's breach of the Development Contract is imputed to CODA Design + Build, Coda Management Group, Krone, and James Lehmann, in their individual capacities.

80. Under Ohio Revised Code § 2721..01, *et seq.*, RCK requests that the Court declare that CODA Design + Build, Coda Management Group, Krone, and Lehmann are alter egos of CODA HOLDING-V LLC and thus are liable for CODA HOLDING-V LLC's breach of the Development Contract and all damages stemming from it, including, but not limited to, RCK's attorneys' fees for the arbitration against CODA HOLDING-V LLC.

### COUNT TWO:
### DECLARATORY JUDGMENT
### (BREACH OF FIDUCIARY DUTY)

81. RCK incorporates by reference its foregoing allegations and averments stated above as if fully rewritten herein.

- 14 -

82. A real, actual, immediate, and justiciable controversy exists between RCK, on the one hand, and Defendants, on the other hand, because RCK's rights, status, or other legal relations are affected, and the declaratory relief sought herein will effectively adjudicate the rights and obligations of the parties.

83. The dispute concerns the fiduciary duties CODA HOLDING-V LLC owes to Journal Storage, LLC and its 81% owner, RCK.

84. CODA HOLDING-V LLC is a closely held limited liability company.

85. Krone and Lehmann are managing members of CODA HOLDING-V LLC.

86. CODA HOLDING V-LLC owns 19% of Journal Storage, LLC.

87. CODA HOLDING V-LLC thus owes a fiduciary duty to Journal Storage, LLC and its 81% owner, RCK.

88. Krone and Lehmann, under Coda Management Group, exerted their control over CODA HOLDING-V LLC and CODA Design + Build to orchestrate the flow of funds relating to the Project and to ensure that they received the most money possible from the Project.

89. Krone and Lehmann knowingly acted against Journal Storage's and RCK's interest in Journal Storage, in connection with their unauthorized self-dealing involving the Project and their failure to adhere to the Development Contract.

90. Krone and Lehmann knowingly acted against Journal Storage's and RCK's interest in Journal Storage when they listed CODA Design + Build as original contractor in the Notice of Commencement filed for the Project. On information and belief, CODA Design + Build is a closely held limited liability corporation that Krone and Lehmann own. Krone and Lehmann's use of CODA Design + Build was unauthorized self-dealing.

- 15 -

91.     CODA HOLDING-V LLC, Krone, and Lehmann further acted against Journal Storage's interest, and RCK's interest in Journal Storage, when they failed to finance Journal Storage's activities and to develop the Property.

92.     CODA HOLDING-V LLC, Krone, and Lehmann further acted against Journal Storage's interest by allowing subcontractors to invoice Lehmann directly for work performed for CODA HOLDING-V LLC on the Project, evidencing that Lehmann was playing fast and loose with CODA's entity structure.

93.     CODA HOLDING-V LLC breached its fiduciary duties, including the duties of disclosure, loyalty, and care, by engaging in the acts and omissions alleged above.

94.     Defendants have benefited financially from CODA HOLDING-V LLC breaching its fiduciary obligations.

95.     RCK has been harmed, and Defendants' conduct was a substantial factor in causing RCK's harm.

96.     As a direct and proximate cause of CODA HOLDING-V LLC's breach of fiduciary duty, RCK has suffered substantial damages.

97.     At RCK's expense, the Defendants have exercised complete domination and control of CODA HOLDING-V LLC.

98.     Based upon the sequence of events described above, CODA HOLDING-V LLC's financial condition has declined dramatically, to the point where it has been administratively dissolved by the Illinois Secretary of State.

99.     Upon information and belief, including inferences that arise from the radical deterioration of CODA HOLDING-V LLC's financial condition during the pendency of the Project, the Defendants ignored corporate formalities, undercapitalized CODA HOLDING-V

LLC, used CODA HOLDING-V LLC as a façade, controlled CODA HOLDING-V LLC's critical business decisions, and/or otherwise abused the corporate form, and prevented CODA HOLDING-V LLC from upholding its fiduciary duties.

100. The Defendants have abused CODA HOLDING-V LLC's corporate form in a manner that was unfair, fraudulent, and works an injustice on RCK.

101. Among other things, assuming RCK prevails on its claims in the related arbitration against CODA HOLDING-V LLC, RCK may be left with an uncollectible debt against CODA HOLDING-V LLC due to Defendants' mismanagement.

102. Accordingly, RCK seeks a declaration that Defendants are alter egos of CODA HOLDING-V LLC and thus are individually and personally liable for CODA HOLDING V LLC's breaches of fiduciary duty.

103. Because CODA Design + Build, Coda Management Group, Krone, and Lehmann are alter egos of CODA HOLDING-V LLC, CODA HOLDING-V, LLC's breaches of fiduciary duty are imputed to CODA Design + Build, Coda Management Group, Krone, and James Lehmann, in their individual capacities.

104. Under Ohio Revised Code § 2721.01, *et seq.*, RCK requests that the Court declare that CODA Design + Build, Coda Management Group, Krone, and Lehmann are alter egos of CODA HOLDING-V LLC and thus are liable for CODA HOLDING-V LLC's breaches of fiduciary duty and all damages stemming from it, including, but not limited to, RCK's attorney's fees for the arbitration against CODA HOLDING-V LLC.

## COUNT THREE:
## UNJUST ENRICHMENT

105. RCK incorporates by reference its foregoing allegations and averments stated above as if fully rewritten herein.

106. On information and belief, CODA Design + Build has been acting as CODA HOLDING-V LLC's agent on the Project in direct contravention of the Development Contract.

107. RCK has conferred benefits upon CODA HOLDING-V LLC, and unwittingly upon CODA Design + Build, Coda Management Group, Krone, and Lehmann, that would be unjust for them to retain without payment, including but not limited to, overpayments of supervision fees, overhead, and profits in excess of $400,000.00. Similarly, after CODA HOLDING-V LLC allowed insurance to lapse on the Property, RCK paid many months of premiums to reinstate coverages for which CODA HOLDING-V LLC has not reimbursed it. RCK has also paid CODA HOLDING-V LLC's proportionate share of the loan repayments, taxes, utilities, and other costs.

108. CODA Design + Build, Coda Management Group, Krone, and Lehmann knowingly retained these benefits.

109. It would be unjust under these circumstances to allow CODA Design + Build, Coda Management Group, Krone, and Lehmann to retain these benefits.

110. RCK has thus suffered substantial damages in an amount to be determined at trial, plus interest, costs, attorney's fees, and any other relief the Court deems just and equitable.

### **PRAYER FOR RELIEF**

WHEREFORE, RCK respectfully requests that the Court enter judgment against Defendants, and in favor of RCK, as follows:

(a) A declaration that Defendants are the alter egos of CODA HOLDING-V LLC and thus are liable for CODA HOLDING-V LLC's breaches of the Development Contract.

(b) A declaration that Defendants are the alter egos of CODA HOLDING-V LLC and thus are liable CODA HOLDING-V LLC's breaches of fiduciary duty.

(c) An award of monetary damages in an amount in excess of $15,000.00 to be determined at trial, attributable to any amounts CODA HOLDING-V LLC is unable to satisfy after its arbitration with RCK;

(d)    In the alternative, an award of monetary damages in excess of $487,762.50 for the benefits that Defendants have unjustly retained to RCK's detriment;

(e)    An award of pre- and post-judgment interest, as allowed by law, and attorneys' fees, expenses, and costs arising out of this matter; and

(f)    Such further relief in law or equity as this Court may deem just and proper under the facts and circumstances of this case.

Dated: February 18, 2024

Respectfully submitted,

By: _____

Andrew G. Fiorella (0077005)
James J. Walsh, Jr. (0096660)
Sarah J. Schneider (0101367)
**BENESCH, FRIEDLANDER,**
      **COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone:    (216) 363-4500
Facsimile:    (216) 363-4588
E-Mail:    afiorella@beneschlaw.com
        jwalsh@beneschlaw.com
        sschneider@beneschlaw.com

*Attorneys for RCK Investments, LLC*

# EXHIBIT A

## DEVELOPMENT CONTRACT

THIS AGREEMENT, made and entered into at Lorain, Ohio, this the _11_ day of _17_, 2022, by and between RCK Investments, LLC (hereinafter "RCK") of 1657 Broadway Avenue, Lorain, Ohio 44052 and the CODA HOLDING – V, LLC (hereinafter "CODA") of _600 Waukegan Rd Ste 129 Northbrook, IL 60062_

WITNESSETH THAT:

WHEREAS, RCK owns that certain real property located at 1657 Broadway Avenue, Lorain, Ohio and that is commonly known and referred to as the "Lorain Journal Building"; and

WHEREAS, RCK has established plans to develop a portion of the Lorain Journal Building into an indoor self-storage facility; and

WHEREAS, CODA has experience in the design, build out and management of self-storage facilities; and

WHEREAS, RCK and CODA have agreed to jointly develop a portion of the Lorain Journal Building into and indoor self-storage facility, all upon the terms and conditions more fully set forth hereinafter;

NOW, THEREFORE, in consideration of the premises and of the true mutual covenants and agreement hereinafter set forth, the parties do agree as follows:

1. **The Development Company.** RCK and CODA shall organize an Ohio limited liability company named "Journal Storage, LLC" for the purposes of jointly developing the indoor self-storage facility contemplated herein. Said limited liability company shall be owned and operated pursuant to the terms of the operating agreement that is attached hereto and fully incorporated herein. Further, RCK and CODA hereby

acknowledge and warrant that the organization of Journal Storage, LLC is not an offering of a security, but is instead the formation of a limited liability company that will be closely held and will not be offered for public sale. After organization of Journal Storage, LLC it shall be owned 81% by RCK Investments, LLC and 19% by CODA.

2. **The Lorain Journal Building.** Currently RCK owns the property with two buildings located at 1657 Broadway Avenue, Lorain, Ohio. RCK and CODA through their entity, Journal Storage, LLC, shall purchase from RCK that portion of the building and property that is identified as Tract "A" on the map attached hereto, and fully incorporated herein, as Exhibit "A" for the purchase price of $1,025,000.00 free and clear of all liens and encumbrances. RCK shall retain from and clear from all claims of CODA or the Journal Storage, LLC that portion of the property identified as Tract "B" on Exhibit "A." RCK and CODA shall have the property surveyed in order to obtain a legal description to fully identify the subject property for transfer. RCK and CODA shall development a shared driveway and parking agreement in relation to the division line between Tracts "A" and "B" to ensure that each has full and unimpeded access to the property.



3.    **DEVELOPMENT AGREEMENT:**

A.    **Financing:**    Journal Storage, LLC shall obtain bank financing in the amount of $3,225,000.00 for the purchase and development of the indoor self-storage facility.  The principals of RCK and CODA shall personally guarantee said loan if necessary to secure the financing.  It is the parties' intention to obtain said financing through Peoples Bank & Trust of Hazard; however, if necessary other lenders may be considered.

B.    **CONSTRUCTION AND DESIGN MANAGEMENT:**

The construction budget shall be $1,755,250.00 per the attached construction budget spreadsheet (Exhibit "B").  CODA shall construct and design the indoor self-storage facility and it shall be paid 10% of the final construction costs for construction management services ($175,525.00) and 10% of the final construction costs ($175,525.00) for overhead and profit.  In the event the construction costs exceed the $1,755,250.00 the first 5% of any budget overrun up to $87,762.50 shall be paid by CODA.  Any payment up to $87,762.50 shall be booked as a cash contribution from CODA and added to its capital account.  All budget overruns thereafter exceeding $87,762.50 shall be paid equally by RCK and CODA and shall be booked as a short term loan to each entity to be paid upon the sale of the property and the terms of the short term loans shall be the same for both RCK and CODA, from a refinance of the property or from cash flow as allowed.  CODA shall not receive any compensation for construction and design or construction management for any amounts that exceed the budget of $1,755,250.00.

C.   **CONSTRUCTION REQUIREMENTS:**   A part of the construction design the following shall be incorporated into the design plans:

1.      The 2nd floor bathroom/locker room must be functional for the tenant operating the softball academy. The small closets will be used by staff and access to the bridge between the two buildings shall be sealed and locked.

2.      The softball tenant shall have 3 year lease with a 2 year option that shall include the 2nd floor bathroom/locker room. The softball tenant shall be required to vacate the premises within 5 years in order to market the property for sale.

3.      RCK or its designee shall have the free and exclusive use of the safe locker room on the 1st floor as designated show below in the red square. Said safe room must be built into another locker in order to not show the safe door to the public.



D.   **TAX CREDITS:**      Currently there exist certain tax credits or incentives with the City of Lorain in the name of RCK. RCK shall retain exclusive ownership, use and control of these tax credits and they shall not be used in any manner for the self-storage property development. If permitted Journal Storage, LLC may apply for separate tax credits if available for the development project from the local taxing authorities.

4.    **POST-DEVELOPMENT MANAGEMENT:**    Following

development and construction of the self-storage units ONE STOP SELF STORAGE

shall assume the day to day management of the property and shall provide access to

RCK, its accountants or other designees for all information necessary to determine the

performance of the business including, but not limited to, rent rolls, income statements,

delinquency lists and sales data.  Within 10 days of the previous month RCK shall be

provided with a monthly performance report of the self-storage business in a format that

is generally accepted in the industry to show rental rates, vacancy rates and financial

performance.  RCK and CODA shall jointly determine a certified public accountant, or

accounting firm, to complete the annual books and tax returns of Journal Storage, LLC.

It shall be the parties' intention to market and sell the Journal Storage, LLC facility at an

appropriate time in the future once the project is stabilized and market conditions permit.

No fees shall be paid to CODA for the management of Journal Storage, LLC self-storage

facility.  One Stop shall pay employees and actual incurred expenses from cash flow of

the project; however, it shall not receive any licensing, franchise or similar fees for use of

the name, processes or management.  CODA shall use best efforts to manage the self-

storage facility in compliance with the operations budge attached hereto as Exhibit "C."

5.    **DEFAULT:**   If either party should default on the terms of this agreement

it is agreed that said default shall be resolved exclusively by arbitration pursuant the rules

of the American Arbitration Association (AAA) and with an arbitrator in Cleveland,

Cuyahoga County, Ohio.  The parties agree that no litigation a public court system shall

be filed except for purposes of enforcing an arbitration award.



6.  **ATTORNEY FEES AND COURT COSTS:**  The  non-breaching party shall be entitled to recover its attorney fees and court costs against the breaching party.

7.  **VENUE:**  It is understood by the parties that this agreement shall be construed pursuant to the laws of the State of Ohio.

8.  **BINDING EFFECT:** This contract and agreement shall be binding on RCK, CODA and their assigns or successors in interest.

9.  **NON-WAIVER:**  Failure of either of the parties to complain of any act or omission on the part of the other party, no mater how long the same may continue, shall not be deemed to be a waiver by said party of any of his or its rights hereunder.  No waiver by either party at any time, express or implied, of any breach of any provision of this contract shall be deemed a waiver of any other provision of this contract or a consent to any subsequent breach of the same or any other provision.

**IN WITNESS WHEREOF,** the parties hereto have set their hands on this the 11th day of July, 20 20 .

RCK INVESTMENTS, LLC

BY: CHRISTOPHER T. RUSSO

CODA HOLDING – V, LLC

BY: James Lehmann
    Manager

**Exhibt A**





# Exhibit B

| | | |
|---|---|---:|
| demo | $ | 70,000.00 |
| demo abatement | $ | 20,000.00 |
| paving | $ | 10,000.00 |
| water | $ | - |
| fence | $ | 20,000.00 |
| concrete | $ | 50,000.00 |
| masonry | $ | 85,000.00 |
| steel | $ | 15,000.00 |
| misc. | $ | 15,000.00 |
| rough carpentry | $ | 10,000.00 |
| finish carpentry | $ | 5,000.00 |
| cabinets | $ | 1,000.00 |
| waterproofing | $ | - |
| insulation | $ | 15,000.00 |
| roofing | $ | 150,000.00 |
| gutters | $ | - |
| garage doors | $ | 20,000.00 |
| doors hardware | $ | 20,000.00 |
| windows | $ | 25,000.00 |
| storefront | $ | 7,500.00 |
| drywall | $ | 20,000.00 |
| painting | $ | 25,000.00 |
| tile | $ | 1,000.00 |
| signage | $ | 20,000.00 |
| bath accessories | $ | 750.00 |
| storage lockers | $ | 280,000.00 |
| elevator | $ | 20,000.00 |
| plumbing | $ | 35,000.00 |
| fire protection | $ | 25,000.00 |
| fire protection sprinklers | $ | 85,000.00 |
| hvac | $ | 325,000.00 |
| electrical | $ | 300,000.00 |
| security system | $ | 30,000.00 |
| | | |
| general conditions | $ | 50,000.00 |

| | | |
|---|---|---:|
| | $ | 1,755,250.00 |
| contingency | $ | 93,700.00 |
| | | |
| supervision | $ | 175,525.00 |
| overhead & profit | $ | 175,525.00 |
| | | |
| Project total | $ | 2,200,000.00 |

# EXHIBIT B

## OPERATING AGREEMENT

## JOURNAL STORAGE, LLC

This Operating Agreement of Journal Storage, LLC, a limited liability company organized pursuant to Ohio Revised Code Chapter 1705, entered into at Lorain, Ohio as of this ____ day of _____, 20___, by and between RCK Investments, LLC and CODA HOLDING-V, LLC as follows:

1. **DEFINITIONS.** The following definitions, when used with an initial capital letter or letters, shall apply throughout this Agreement.

1.1 " Act" means Ohio Revised Code Chapter 1705, as amended from time to time.

1.2 "Capital Account" means an account to be maintained for each member which complies with the requirements of Section 1.704-1(b) (2) (iv) of the regulations under the Code.

1.3 "Code" means the Internal Revenue Code of 1986, as amended, the applicable Treasury Regulations there under, and any comparable laws and regulations enacted or promulgated in place thereof.

1.4 "Company" means the Journal Storage, LLC, the Ohio limited liability company which is the subject of this Agreement.

1.5 "Distribution Cash" as of any date, means all cash from all sources (including proceeds from a sale or refinancing), held by the Company as of such date less any amounts reasonably deemed necessary by the Members pursuant to Paragraph 9.2 herein to be reserved for normal working capital requirements, contingent liabilities, and such other purposes as the Members determine pursuant to Paragraph 9.2 herein to be necessary or advisable for the conduct of the Company's business.

1.6 "Members" means those persons or entities identified in the opening paragraph herein, collectively, and "Member" means any one of the referred to.

1.7 "Membership Interest" means a Member's interest in the Company stated as a percentage as set forth in Section 6 hereof.

1.8 "Net Profit" or "Net Loss" means, for each fiscal year of the Company, the Company's taxable income or loss for such fiscal year, as determined under Section 703 (a)(1)(B) of the Code, which is not otherwise taken into account in computing Net Profit or Net Loss, shall be added; and any Expenditures which are not deductible in computing income, which are not properly chargeable to a capital account, as described in Section 705 (a)(2)(B) of the Code, and which are not otherwise taken into account in computing Net Loss, shall be deducted.

1.9 "Secretary" means the Secretary of State of Ohio.

1

2. **FORMATION OF COMPANY**.

    2.1    **Organization**. The Members hereby form the Company as a limited liability company pursuant to the act in accordance with the Article of Organization to be filed with the Secretary.

    2.2    **Operating Agreement**. This Operating Agreement including any provisions of the Code incorporated herein by reference, shall be the sole agreement of the Members with respect to the operation of the Company, and no oral agreements among the Members shall modify this Agreement in any way.

    2.3    **Waivers:** Each member executing this operating agreement and/or owning a membership interest in the Company warrants to the other members that they enter into the Company ownership understanding that the ownership in the Company is an investment with risks that their investment may be lost or reduced due to the nature of the investment and the Company's business. Further, each member acknowledges that there is no guarantee of return on investment and the ownership interest is not governed by any state or federal securities laws but is a private investment among the members. Further, each member acknowledges that no promises of return on investment have been made to them by another member or officer of the Company.

3. **COMPANY**.

    3.1    **Name**. The name of the Company shall be Journal Storage, LLC.

    3.2    **Principal Office**. The principal office of the Company shall be located at 1657 Broadway Avenue, Ste 1, Lorain, Ohio 44052.

    3.3    **Purpose**. The purpose of the Company is to engage in any lawful activity and specifically to develop, operate or manage a self-storage facility in Lorain, Ohio..

4. **TERM**. The existence of the Company shall commence on the date its Articles of Organization are filed with the Secretary, and the Company shall continue in existence until terminated as provided in Paragraph 14.1 of this Agreement.

5. **CAPITAL**.

    5.1  **Capital Contributions**. The Members will contribute cash to the capital of the Company, in the amount and when called for by the Members pursuant to Paragraph 9.2 herein. The Members shall not be compelled to make any capital contribution absent an affirmative vote of all members and no member shall bring legal action asking any court to compel a contribution absent an affirmative vote of all members.

    5.2    **Other Additional Contributions**. Except as provided in Paragraph 5.1, or as agreed to in writing by the Member, no Member shall have any obligation or liability to the Company or to the other Members to make any contributions to the capital of the

Company.  No member shall be compelled by any judicial action, judgment or decree to make additional capital contributions.

5.3 **Interest and Return of Capital Contributions**.  No member shall be entitled to any interest on such Member's contribution to the capital of the Company, and except as provided in Section 14, no Member shall have the right to demand or receive payment of the return of any part of such Member's Capital Account.

**6. MEMBERSHIP INTERESTS**.  The Membership Interests of the Members in the Company shall be as set forth on Exhibit A attached hereto.

**7. DISTRIBUTIONS TO MEMBERS**.

7.1 <u>Distributions of Cash Flow</u>.  The Cash Flow held by the Company and not required in the operation of the Company's business (including the establishment of reasonable reserves) will be distributed to the Members, from time to time, as the operations manager, or majority of the members, may determine in its sole and absolute discretion. No Member shall be entitled to make withdrawals from such Member's Capital Account or from the Company's capital, except to the extent of distributions made pursuant to this Section 7. All distributions of the Cash Flow shall be made among the Members as follows:

(a) First, any Cash Flow will be distributed to the Members for repayment of their initial cash contributions to the Company.  It is agreed that once repaid for the initial cash contributions that the Members ownership percentages will remain the same and said distributions will not reduce their ownership percentage.

(b) Second, any Cash Flow will be distributed *pro rata* in proportion and to the extent of their positive Net Capital Contributions, until their Net Capital Contributions have been reduced to zero;

(c) Third, to the Members pro rata in proportion and to the extent of their positive Capital Account balances; and

(c) Fourth, following any priority distributions required under Section 7.1 above, any remaining balance will be distributed to the Members in proportion to their respective Interests.

7.2 <u>Income Tax Distributions</u>.  Notwithstanding anything to the contrary in Paragraph of this Agreement, the Company agrees to make distributions of cash to its Members annually in sufficient amounts for the Members to pay on a timely basis federal and state income taxes, including any required estimated income tax payments, on the Company's taxable income and gain (net of deductions and credits) for such calendar year to the extent distributions made under Paragraph 7.1 for such year are not sufficient for this purpose.  For the purposes of determining the amount of such distributions, each Member is deemed to be a resident of the City of Cleveland, the State of Ohio, and to fully utilize any losses, deductions, and credits passed through under Code Section 702. Anything to the contrary herein notwithstanding, no distributions may be made to any

3

Member pursuant to this Section at any time when payments on any Company obligation shall be considered delinquent, or if such payment would cause the Company to default on any Company obligation, or to the extent the Manager otherwise determines in his sole and absolute discretion that Company cash is needed for the management of the Business. Whether such delinquency or default shall occur will be determined by the Manager in his sole discretion. All distributions under this Paragraph 7.2 will be made among the Members in proportion to their allocable share of taxable income as determined under the Tax Appendix for such calendar year with such amount treated as payment on amounts otherwise payable under Paragraph 7.1 in the order they would otherwise have been distributed and shall be credited against amounts otherwise payable under those Sections.

7.3     <u>Distribution of Liquidation Proceeds</u>.  Liquidation Proceeds shall be distributed in accordance with Section 14.2.

## 8. TAX PROVISIONS.

8.1     **Allocation of Net Profit and Net Loss.**  For federal income tax purposes, Net Profit or Net Loss for each fiscal year shall be allocated to the Members in proportion to their respective Membership Interests, except as provided in Paragraph 8.2.

8.2     **Section 704(c) Allocation.**  Notwithstanding Paragraph 8.2, any income, gain, loss, and deduction(s) recognized by the Company for income tax purposes in any fiscal year that is required to be allocated among the Members in accordance with section 704(c) of the Code shall be allocated to the Members for income tax purposes in the manner so required.

8.3     **Special Allocations.**  Items of income, gain, loss and deduction shall be allocated in accordance with the provisions of this Paragraph 8.3 without regard to the allocation provision contained in Paragraph 8.2, in the following order:

8.3.1 Qualified Income Offset.  If any Member's Capital Account is unexpectedly adjusted for, or such Member is unexpectedly allocated or there is unexpectedly distributed to such Member, any item described in Treas. Reg. Section 1.704-1 (b) (2) (ii) (d) (4)-(6), and such treatment creates or increases a Member's adjusted capital account deficit, then without regard to the allocations provided in Paragraph 8.2, the Company shall allocate to such Member items of Company income and gain (consisting or a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such adjusted capital account deficit as quickly as possible.

8.3.2 Gross Income Allocation.  In the event that a Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount the Member is obligated to restore pursuant to any provision of this Operating Agreement, and (ii) the amount the Member is deemed to be obligated to restore pursuant to Treas. Reg. Section 1.704-2 (g) and (i) (5), the Member shall be specially allocated items of Company income and gain the amount of such excess as quickly as possible, provided that an allocation pursuant to this

4

paragraph shall be made if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Paragraph 8.3 have been tentatively made as if this Paragraph 8.3 (b) were not in this Operating Agreement.

8.4 **Tax Matters.** All tax returns of the Company shall be prepared under the direction of the Members pursuant to Paragraph 9.2 herein. The Members, pursuant to Paragraph 9.2 herein, shall have the right to make any and all elections available under applicable tax laws. Rodney G. Davis is hereby designated as the "Tax Matters Partner" for the Company (as such term is defined in Section 623 (a) (7) of the Code).

## 9. MANAGEMENT.

9.1 **Member Managed.** Responsibility for managing the operations of the company shall reside in the Members pursuant to Paragraph 9.2 herein and in accordance with the Act and they shall have the sole and exclusive authority to manage the business of the Company including, without limitation, the following rights, each of which may be exercised in such manner and upon such terms and conditions as the Members, in their judgment, and pursuant to Paragraph 9.2 herein determine to be in the best interests of the Company:

9.1.1 to acquire real, personal, tangible and intangible property for the operation of the Company's business;

9.1.2 to sell or otherwise dispose of the Company property;

9.1.3 to borrow money to finance the Company's activities and to pledge, mortgage, grant security interests in or otherwise encumber Company property to secure the repayment of such loans;

9.1.4 to employ, retain or otherwise secure the services of any employees, attorneys, accountants, advisers and others deemed necessary by the Members to facilitate the conduct of the Company's business;

9.1.5 to develop property in any way that the Members deem appropriate; and,

9.1.6 to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business or affairs.

9.2 **Vote Required.** All actions which are to be taken by the Members shall require the affirmative vote of a majority interest of all Members including the following:

(a) Any requirement of additional capital contributions;

(b) The purchase of any Member's Membership Interest;

(c) Any amendment of the Articles of Organization or this Operating Agreement;

Unanimous vote of the members shall be required for the following actions:

(d) The Admission of new members, and

(e) The sale of substantially all of the assets of the Company;

9.3 **Officers.** Christopher Russo and Rodney G. Davis, jointly and severally, shall be the operations managers and the financial operations manager, respectively, and shall be responsible for the day to day operations of the Company and authorized to make any and all decisions customary and reasonable for furtherance of same with the exception of those decisions set out in Paragraph 9.2 which shall be subject to the vote of all Members. If the event of the death or disability of either Christopher Russo or Rodney G. Davis it is agreed that the other shall immediately assume both management roles pending the admittance of their heir at law as a member. The appointment of the operations managers may be modified by a unanimous vote of the Members.

9.3.1 It is agreed that Christopher Russo, Rodney G. Davis, Scott Krone and James Lehmann shall be signatories on the company bank accounts at JP Morgan Chase, N.A. and Scott Krone and James Lehman shall have authority to make all transaction up to $5,000.00 in the day to day management of the storage facility; however, any transactions exceeding $5,000.00 shall be agreed to by Christopher Russo and Rodney G. Davis.

9.3.2 One Stop Self Storage shall manage the day to day operations of the storage facility through Scott Krone and James Lehman. All daily financial transactions shall be made in the company operating account at JP Morgan Chase, NA and the company shall maintain an additional financial management account at JP Morgan Chase, NA for the payment of the mortgage, notes and other financial commitments of the company. All members shall have full access to the daily financial transactions of the company.

9.3.3 For any action herein requiring a vote of the members said vote may be taken by electronic, digital or facsimile vote. A copy of said vote shall be retained in the books of the company and a copy or electronic signature of the Member's signature shall be deemed an original for purposes herein.

## 10. INSURANCE INDEMIFICATIONS.

10.1 **Insurance.** The Members shall cause the Company to obtain and maintain comprehensive general and product liability insurance, casualty insurance covering the Company's insurable property and insurance covering such other risks as are normally insured in comparable businesses as the Members determine, pursuant to Paragraph 9.2 herein to be appropriate to protect the interest of the Company.

10.2 **Limited Liability.** No Member or Officer of the company shall be liable, responsible or accountable in damages or otherwise to the company or any Member for any action taken on behalf of the Company within the scope of authority of such Member or such

officer, or reasonably believed by such person to be within the scope of his authority, or for any omission.

10.3 **Indemnification.** The Company shall reimburse, indemnify, defend and hold harmless the Members and each officer from and against any loss, expense, damage or injury suffered or sustained by the Company or the Members by reason of any acts or omissions arising out of such person's activities on behalf of the Company or in furtherance of the interests of the Company, including, without limitation, any judgment, award, settlement reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, but excluding loss, expense, damage or injury caused by or resulting from any acts or omissions performed or omitted fraudulently or in bad faith or which constitute gross negligence or warrant and willful misconduct.

10.4 **Key Personnel Insurance.** The Members may cause the Company to obtain and maintain Key Personnel Insurance on Christopher Russo and Rodney G. Davis, or such other personnel or individual as deemed necessary by the operations managers.

11. **BANKING.** The funds of the Company shall be kept in a separate account or accounts in the name of the Company. All withdrawals from any such bank accounts or investments shall be made on the signature of one of the Members.

12. **ACCOUNTING.** The fiscal year of the Company shall be the calendar year. The Company shall keep its books in accordance with the cash method of accounting pursuant to generally accepted accounting principles. The Company's books of account and records shall be maintained at the Company's principal. Any Member shall have the right to inspect and make copies of the Company's books and records at such Member's sole cost and expense. The members shall have the right to review all financial accounts at any financial institution by means of on-line access; however, no member shall be permitted to use on-line access to conduct any financial transaction or transfers on behalf of the company.

13. **RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTEREST.**

13.1 Voluntary Transfer. If a Member intends to transfer any Membership Interest he owns to any person other than the Company, he shall give written notice to the Company and to any non-selling Member(s) ("Remaining Member(s)") of his intention to transfer his Membership Interest. Said written notice shall state: (i) the percentage of his Membership Interest he desires to transfer; (ii) the name, business and residence address of the proposed transferee; and (iii) whether or not the transfer is made at arm's length for full and valuable consideration, and if so, the amount of the consideration and the other terms of the sale. For sixty (60) days following the Company's receipt of the Transfer Notice (the "Company Option Period"), the company shall have the option to purchase all or any portion of the Membership Interests which are proposed to be transferred, for the price and upon the terms set forth in Paragraph 13.9, and if the Company does not exercise its option to purchase all, but not less than all, of such Membership Interest within said sixty (60) day period, the Remaining members for a

7

period of fifteen (15) days after the expiration of the Company Option Period shall have an option to purchase all of the Membership Interests which have not been purchased by the Company, at the price and upon the terms set forth in Paragraph 13.9 in proportion to their Membership Interests.

Notwithstanding the above, any Member may transfer his membership Interest solely for estate planning purposes to a trust or family members provided that the Member retains control over the Membership Interest

13.2 Involuntary Transfers. In the event of the death, incompetency, bankruptcy, withdrawal or dissolution of a Member (a "Withdrawing Member"), (i) for a period of ninety (90) days after the Company receives actual notice thereof, the Company shall have the option to purchase all or any portion of the Withdrawing Member's Interest, for the price and upon the terms set forth in Paragraph 13.9(a). If the Company does not exercise its option to purchase all of the Withdrawing Member's Interest, for a period ending fifteen (15) days after the close of the company's ninety (90) day option period, the Remaining Members, in proportion to their Membership Interests, shall have an option to purchase all, but not less than all, of such Withdrawing Member's Interest at the price set forth in Paragraph 13.9(a) and upon the same terms as provided for herein regarding a voluntary transfer in Paragraph 13.1 of this Operating Agreement. Notwithstanding the foregoing, neither the Company nor the Remaining Members may exercise their options, the provisions of Paragraphs 13.3 and 13.7 shall apply to the Withdrawing Member and his/her representative, if any.

13.3 Exercise of Options.

13.3.1 Means of Exercise. The Company and the Remaining Members who exercise any option granted by this Section 13 shall do so by giving written notice ("Exercise Notice") of the exercise of their respective options within the time periods provided in this Section 13 to the Members and, in the case of an option upon involuntary transfer, to the Withdrawing Member's representative.

13.3.2 Voting to Exercise. A transferor, in his/her capacity as a Member, shall not be entitled to vote in the company's determination of whether to exercise any purchase option granted by this Operating Agreement or with respect to any decisions or actions involving the purchase option or the consummation of the exercise thereof.

13.4 Nonexercise of Options. If the Remaining Members and the Company fail to exercise their purchase options to acquire all of the Membership Interests which are proposed to be transferred in compliance with Paragraph 13.1 of this Operating Agreement, the transferor may, within thirty (30) days following the expiration of the option period for

8

the Remaining Members, transfer the Membership Interest to the transferee named in the Transfer Notice, subject to the terms of this Operating Agreement; provided, however, that such transfer must be made upon the terms and for the considerations specified in said Transfer Notice. If the transfer is not made upon the terms or is not to the transferee stated in the Transfer Notice, or if the transfer is not made with said thirty (30) day period, or if the transferor, after the transfer, reacquires all or any portion of the transferred membership Interests, the initial transfer shall be void and without legal or other effect.

13.5    Requirements for Transfer. Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky: law, and the rules promulgated there under), and subject to the provisions of Paragraphs 13.1, 13.3 and 13.7 which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his place, except in accordance with Paragraph 13.7 hereof), by a written instrument, the whole or any part of his Membership Interest, provided that: (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168 (h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he is acquiring such Membership Interest or such part thereof for his own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708 (b) of the Code) or the termination of its status as a partnership under the code; provided, further, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Paragraphs 13.5 (ii) and (iv) above should each of them, in their sole discretion, determine that the cost or time delays involved in procuring such opinions may impede the company's ability to effect the contemplated transfer.

13.6    Effectiveness of Assignment. No transfer shall be effective unless and until the requirements of Paragraph 13.7 are satisfied. The transfer by a Member of all or part of his Membership Interest shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Paragraph 13 have been met, and the company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connected with such transfer; provided, however, that the Remaining members may elect to waive this fee in their sole discretion. All distributions made thereafter in respect of the Membership Interest of the transferor shall be made to the transferee of such transferor's Membership Interest.

9

13.7  Requirement for Admission. No transferee of the whole or a portion of a Member's Interest shall have the right to become a Member unless and until all of the following conditions are satisfied:

(a) A duly executed and acknowledged written instrument of transfer approved by the Remaining Members has been filed with the Company setting forth (i) the intention of the transferee to be admitted as a Member; (ii) the notice address of the transferee; and (iii) the percentage of Membership Interests transferred by the transferor to the transferee;

(b) The opinions of counsel described in Paragraph 13.5 above are delivered to the Company and the Remaining Members, subject to the Remaining Members' right to waive the delivery of these opinions in their sole discretion.

(c) The transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Remaining members may reasonably deem necessary or desirable to effect such admission, including without limitation: (i) the written acceptance and adoption by the transferee of the provisions of this Operating Agreement including a representation and warranty that the representations and warranties in Paragraph 17.2 are true and correct with respect to the transferee; (ii) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law; and (iii) the transferee's completion, if applicable, of an acknowledgment of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(d) The admission is approved by the Remaining members, the granting or denial of which shall be within the sole and absolute discretion of the Remaining Members; and

(e) A transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Paragraphs 13.5 and 13.7, subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

13.8  Rights of Mere Assignees. If a transferee of a Membership Interest is not admitted as a Member, he shall be entitled to receive the allocations and distributions attributable to transferred Membership Interest, but he shall not be entitled to inspect the Company's

books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

13.9   Purchase Price and Terms.

   (a)   Purchase Price. If the Company or the Remaining Members exercises its or their option (the "Optionor"), the purchase price which the Optionor shall pay for the transferor's Membership Interest following the exercise of an option to purchase under Paragraph 13.1 or 13.2 shall be an amount equal to: (1) the purchase price as stated in the Transfer Notice where (a) the proposed transfer is for full and adequate consideration and (b) the transferee identified in the Transfer Notice is not a member of the transferor's family or an affiliate of the transferor; and (2) in all other cases, the value of the transferor's Membership Interest as mutually agreed upon by the Members. If the parties cannot agree within ten (10) days after the date of the final Exercise Notice, the purchase price shall be the amount which the transferor would receive if all the Company property were sold at is appraised fair market value and the proceeds were applied in accordance with Paragraph 14.2. An independent appraiser ("Qualified Appraiser") experienced in conducting appraisals of assets similar to the Company property shall conduct an appraisal of all the company property to determine its fair market value ("First Appraisal"). The Optionor shall select and pay for a Qualified Appraiser to perform the First Appraisal. If, with five (5) days after receipt of the First Appraisal, the parties cannot agree, the transferor may obtain, at his own cost, a second appraisal ("Second Appraisal") of the fair market value of the Company property by a Qualified Appraiser of his choice. If the parties agree, the Second Appraisal shall be used to determine the value of the Company property. If the two appraisals are performed and the parties cannot agree within ten (10) days after receipt of the second appraisal which of the appraisals accurately reflects the value of the company property, then the two appraisers selected under this subparagraph shall select a Qualified Appraiser to conduct a third appraisal ("Third Appraisal") of the fair market value of the Company property. The fair market value of the Company property established by the Third Appraisal shall be final and binding in all respects on all parties. The Optionor and the transferor shall each pay fifty (50%) percent of the costs of the Third Appraisal.

   (b)   Payment of Purchase price and Closing. The closing of any sale and purchase of the transferor's Membership Interest in the Company shall be within thirty (30) days from the later of (1) the date of the final Exercise Notice; or (2) delivery of the final appraisal performed pursuant to Paragraph 13.9(a). The Optionor shall pay the purchase price: (1) at the time in accordance with the terms and conditions as stated in the Transfer Notice, where the purchase price is determined pursuant to Paragraph 13.9(a); or (2) at the closing in all other cases, unless the parties agree on different terms. The transferor shall deliver documents satisfactory to the Optionor conveying his Membership Interest free and clear of all liens, claims and encumbrances, any of which may be paid out of the purchase price, with the remainder, if any, paid to the

11

transferor. If the purchase price is insufficient to satisfy any such liens, the transferor shall discharge the balance.

13.10    LIFE INSURANCE: It is understood that from time to time the company may maintain life insurance on company personnel including the managers.

## 14. TERMINATION OF COMPANY.

14.1 **Termination Events.** The Company shall be liquidated and dissolved and its affairs shall be wound up upon the first to occur of any of the following (each a "Termination Event"):

14.1.1   The sale of all or substantially all of the Company's assets;

14.1.2   The agreement of all members to dissolve the Company;

14.1.3   The entry of a final and non-appealable decree of judicial dissolution under Section 1705.48 of the Act; and

14.1.4 The death, insanity, bankruptcy, retirement, resignation or expulsion of Member, unless the business of the Company is continued by consent of a majority of remaining Members.

14.2 **Winding Up.** Upon the occurrence of a Termination Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Members in accordance with the Act. No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's assets and liabilities, and the Company's assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefore, shall be applied and distributed in the following order:

14.2.1   First, to the payment and discharge of all company liabilities to creditors other than Members;

14.2.2   Second, to the establishment of any reserves reasonably deemed necessary by the Members for any contingent liabilities of the Company. Any such reserves

shall be deposited in an escrow account in the name of the Company for the purpose of (i) paying any such contingent liabilities, and (ii) at the expiration of such period deemed advisable by the Members, distributing the balance of such reserves in the manner hereinafter provided;

14.2.3　Third, to the payment and discharge of all loans by and net company liabilities to members and in the event that more than one Member has made a loan to the Company, each Member shall be repaid in proportion to the amounts of the loans. For example, if Member A has loaned $100,000.00 and Member B has loaned $50,000.00 and there is only $12,000.00 to distribute, Member A will receive $8,000.00 and Member B will receive $4,000.00; and

14.2.4　The balance, if any, to the Members in accordance with their percentage ownership set forth in Exhibit "A" attached hereto.

14.3　**Date of Termination.**  The Company's existence shall continue until its assets have been distributed in accordance with Paragraph 14.2, and its existence shall terminate when a Certificate of Dissolution has been filed with the Secretary in accordance with the Act. The establishment of any reserves pursuant to Paragraph 14.2.2 shall not extend the Company's existence, but any such reserves shall be distributed in the manner provided in Section 14.2 when the obligations or liabilities for which such reserves were established have been satisfied or otherwise disposed of.

15. **OTHER ACTIVITIES.**  Each member may own or engage or invest in any other business venture or activity independent of the Company without any obligation to offer any interest or the right to participate therein to the company or the other Members.

16. **ARBITRATION.**

16.1　**Controversies.**  Any controversy between the Members relating to this Agreement or the transactions contemplated hereby shall be submitted to arbitration in Columbus, Ohio, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.

16.2　**Arbitrator's Decision.**  The decision of the arbitrator(s) and any award pursuant thereto shall be final, binding and conclusive evidence on the parties and shall be non-appealable. final judgment on such decision and any award may be entered by any court of competent jurisdiction.

16.3　**Costs.**  The arbitrator(s) may award the costs of the arbitration proceeding including, without limitation, reasonable attorneys' fees, arbitrators' fees and out-of-pocket expenses incurred in connection with the arbitration hearing and prehearing proceedings between the parties in such manner as the arbitrator(s) may determine to be reasonable and equitable in light of the outcome of the arbitration proceeding.

17. **GENERAL PROVISIONS.**

17.1 **Liability of Members.** Except as otherwise provided under the Act, (a) the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and (b) none of the Members or officers shall be personally liable for any judgment, decree, or order of a court, or in any other manner for any debt, obligation, or liability of, the Company solely by reason for being a Member or officer.

17.2 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and other Members that he/she is acquiring its interest in the Company for his/her own account as an investment and without an intent to distribute the same. Each Member acknowledges that the Membership Interests have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirement.

17.3 **No Partnership Intended for Non-Tax Purposes.** The Members have informed the Company under the Act, and expressly do not form a partnership under the Ohio Uniform Partnership Act (Ohio Revised Code Chapter 1782). The Members do not intend to be partners with one another, or partners as to any third party. To the extent any Member represents to another person in any manner that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to the Company and to such other Members for any loss, damage or liability caused by such wrongful representation.

17.4 **Amendments.** This Agreement may be amended only by written approval of all of the Members.

17.5 **Severability.** Every provision of this Agreement is severable. If any term or provision hereof is illegal, invalid or unenforceable for any reason, such illegality, invalidity or unenforceability shall not affect the validity, legality or enforceability of the remainder of this Agreement.

17.6 **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

17.7 **Binding Effect.** This agreement shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

17.8 **Captions.** The captions contained in this Agreement are for reference purposes only and are not intended and shall not be deemed to describe, interpret, define or limit the scope, extent or intent of this agreement or any provision hereof

17.9 **Notices.** Any notices required herein shall be sent by certified mail, return receipt requested, to the Members at the address set forth on Exhibit A.

17.10 **Multiple Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, this Agreement has been executed by the Members of the date first above written.

**MEMBERS:**

**RCK INVESTMENTS, LLC**

_____
Christopher Russo

_____
Rodney Davis

**CODA HOLDING-V, LLC**

_____
SCOTT KRONE

_____
JAMES LEHMANN

16

## **EXHIBIT A**

## **JOURNAL STORAGE, LLC UNIT BREAKDOWN**

| Current | Units Owned | Distribution %* |
|---|---|---|
| RCK INVESTMENTS, LLC | 50 81 | 50 81 |
| CODA HOLDING-V, LLC | 50 19 | 50 19 |
| | 100 | 100.00 |

17

# EXHIBIT C

The Official website of the Illinois Secretary of State - Here's how you know...

About the Office  Publications & Forms  News  Contact

Select Language

Powered by Translate

Disclaimer

**ilsos.gov**

The Office of the Illinois
Secretary of State

DMV Services ·    Business ·    Departments ·    More ·

## Business Entity Search

### Entity Information

| | | | |
|---|---|---|---|
| **Entity Name** | CODA HOLDING V LLC | | |
| **Principal Address** | 600 WAUKEGAN ROAD, STE 129 NORTHBROOK,IL 600620000 | | |
| **File Number** | 11955428 | **Status** | INVOLUNTARY DISSOLUTION on 12-13-2024 |
| **Entity Type** | LLC | **Type of LLC** | Domestic |
| **Org. Date/Admission Date** | 06-17-2022 | **Jurisdiction** | IL |
| **Duration** | PERPETUAL | | |
| **Annual Report Filing Date** | 00-00-0000 | **Annual Report Year** | 2024 |
| **Agent Information** | JEFFREY M GALKIN 180 N LA SALLE ST STE 2750 CHICAGO, IL 60601-2713 | **Agent Change Date** | 05-14-2024 |

### Services and More Information

Choose a tab below to view services available to this business and more information about this business.

| Available Services | Managers | Old LLC Name | Assumed Name | Series Name | File History |
|---|---|---|---|---|---|

Reinstate your LLC

---

**ilsos.gov**

**Office of the Secretary of State**

213 State Capitol
Springfield, IL 62756

115 S. LaSalle St., Ste. 300
Chicago, IL 60603

800-252-8980 (toll free in Illinois)

217-785-3000 (outside Illinois)

About Us

Contact Forms

**Quick Links**

Discrimination Complaint Form

Facility Customer Feedback Form

Freedom of Information

IL Vehicle Hijacking and Motor Vehicle Theft Prevention & Insurance Verification Council

Report SSA Scams

Rules of the Road

Sexual Harassment Complaint

Vendor Communication

**All Departments**

Accounting Revenue

Administrative Hearings

BABD

Budget & Fiscal Management

Business Services

Communications

Court of Claims

Driver Services

Illinois State Archives

Illinois State Library

Index

Information Technology

Inspector General

Legislative Affairs

Merit Commission

Organ/Tissue Donation

Personnel

Physical Services

Secretary of State Police

Securities

Vehicle Services

© 2025 Illinois Office of the Secretary of State · Privacy Policy · Terms of Use · Accessibility Statement

Amber Alert · National Center for Missing & Exploited Children

