## OPERATING AGREEMENT

## JOURNAL STORAGE, LLC

This Operating Agreement of Journal Storage, LLC, a limited liability company organized pursuant to Ohio Revised Code Chapter 1705, entered into at Lorain, Ohio as of this ____ day of _____, 20___, by and between RCK Investments, LLC and CODA HOLDING-V, LLC as follows:

1. **DEFINITIONS.** The following definitions, when used with an initial capital letter or letters, shall apply throughout this Agreement.

    1.1 "Act" means Ohio Revised Code Chapter 1705, as amended from time to time.

    1.2 "Capital Account" means an account to be maintained for each member which complies with the requirements of Section 1.704-1(b) (2) (iv) of the regulations under the Code.

    1.3 "Code" means the Internal Revenue Code of 1986, as amended, the applicable Treasury Regulations there under, and any comparable laws and regulations enacted or promulgated in place thereof.

    1.4 "Company" means the Journal Storage, LLC, the Ohio limited liability company which is the subject of this Agreement.

    1.5 "Distribution Cash" as of any date, means all cash from all sources (including proceeds from a sale or refinancing), held by the Company as of such date less any amounts reasonably deemed necessary by the Members pursuant to Paragraph 9.2 herein to be reserved for normal working capital requirements, contingent liabilities, and such other purposes as the Members determine pursuant to Paragraph 9.2 herein to be necessary or advisable for the conduct of the Company's business.

    1.6 "Members" means those persons or entities identified in the opening paragraph herein, collectively, and "Member" means any one of the referred to.

    1.7 "Membership Interest" means a Member's interest in the Company stated as a percentage as set forth in Section 6 hereof.

    1.8 "Net Profit" or "Net Loss" means, for each fiscal year of the Company, the Company's taxable income or loss for such fiscal year, as determined under Section 703 (a)(1)(B) of the Code, which is not otherwise taken into account in computing Net Profit or Net Loss, shall be added; and any Expenditures which are not deductible in computing income, which are not properly chargeable to a capital account, as described in Section 705 (a)(2)(B) of the Code, and which are not otherwise taken into account in computing Net Loss, shall be deducted.

    1.9 "Secretary" means the Secretary of State of Ohio.

2. **FORMATION OF COMPANY.**

   2.1 **Organization.** The Members hereby form the Company as a limited liability company pursuant to the act in accordance with the Article of Organization to be filed with the Secretary.

   2.2 **Operating Agreement.** This Operating Agreement including any provisions of the Code incorporated herein by reference, shall be the sole agreement of the Members with respect to the operation of the Company, and no oral agreements among the Members shall modify this Agreement in any way.

   2.3 **Waivers:** Each member executing this operating agreement and/or owning a membership interest in the Company warrants to the other members that they enter into the Company ownership understanding that the ownership in the Company is an investment with risks that their investment may be lost or reduced due to the nature of the investment and the Company's business. Further, each member acknowledges that there is no guarantee of return on investment and the ownership interest is not governed by any state or federal securities laws but is a private investment among the members. Further, each member acknowledges that no promises of return on investment have been made to them by another member or officer of the Company.

3. **COMPANY.**

   3.1 **Name.** The name of the Company shall be Journal Storage, LLC.

   3.2 **Principal Office.** The principal office of the Company shall be located at 1657 Broadway Avenue, Ste 1, Lorain, Ohio 44052.

   3.3 **Purpose.** The purpose of the Company is to engage in any lawful activity and specifically to develop, operate or manage a self-storage facility in Lorain, Ohio..

4. **TERM.** The existence of the Company shall commence on the date its Articles of Organization are filed with the Secretary, and the Company shall continue in existence until terminated as provided in Paragraph 14.1 of this Agreement.

5. **CAPITAL.**

   5.1 **Capital Contributions.** The Members will contribute cash to the capital of the Company, in the amount and when called for by the Members pursuant to Paragraph 9.2 herein. The Members shall not be compelled to make any capital contribution absent an affirmative vote of all members and no member shall bring legal action asking any court to compel a contribution absent an affirmative vote of all members.

   5.2 **Other Additional Contributions.** Except as provided in Paragraph 5.1, or as agreed to in writing by the Member, no Member shall have any obligation or liability to the Company or to the other Members to make any contributions to the capital of the

Company. No member shall be compelled by any judicial action, judgment or decree to make additional capital contributions.

5.3 **Interest and Return of Capital Contributions**. No member shall be entitled to any interest on such Member's contribution to the capital of the Company, and except as provided in Section 14, no Member shall have the right to demand or receive payment of the return of any part of such Member's Capital Account.

6. **MEMBERSHIP INTERESTS**. The Membership Interests of the Members in the Company shall be as set forth on Exhibit A attached hereto.

7. **DISTRIBUTIONS TO MEMBERS**.

   7.1 Distributions of Cash Flow. The Cash Flow held by the Company and not required in the operation of the Company's business (including the establishment of reasonable reserves) will be distributed to the Members, from time to time, as the operations manager, or majority of the members, may determine in its sole and absolute discretion. No Member shall be entitled to make withdrawals from such Member's Capital Account or from the Company's capital, except to the extent of distributions made pursuant to this Section 7. All distributions of the Cash Flow shall be made among the Members as follows:

   (a) First, any Cash Flow will be distributed to the Members for repayment of their initial cash contributions to the Company. It is agreed that once repaid for the initial cash contributions that the Members ownership percentages will remain the same and said distributions will not reduce their ownership percentage.

   (b) Second, any Cash Flow will be distributed *pro rata* in proportion and to the extent of their positive Net Capital Contributions, until their Net Capital Contributions have been reduced to zero;

   (c) Third, to the Members pro rata in proportion and to the extent of their positive Capital Account balances; and

   (c) Fourth, following any priority distributions required under Section 7.1 above, any remaining balance will be distributed to the Members in proportion to their respective Interests.

   7.2 Income Tax Distributions. Notwithstanding anything to the contrary in Paragraph of this Agreement, the Company agrees to make distributions of cash to its Members annually in sufficient amounts for the Members to pay on a timely basis federal and state income taxes, including any required estimated income tax payments, on the Company's taxable income and gain (net of deductions and credits) for such calendar year to the extent distributions made under Paragraph 7.1 for such year are not sufficient for this purpose. For the purposes of determining the amount of such distributions, each Member is deemed to be a resident of the City of Cleveland, the State of Ohio, and to fully utilize any losses, deductions, and credits passed through under Code Section 702. Anything to the contrary herein notwithstanding, no distributions may be made to any

Member pursuant to this Section at any time when payments on any Company obligation shall be considered delinquent, or if such payment would cause the Company to default on any Company obligation, or to the extent the Manager otherwise determines in his sole and absolute discretion that Company cash is needed for the management of the Business. Whether such delinquency or default shall occur will be determined by the Manager in his sole discretion. All distributions under this Paragraph 7.2 will be made among the Members in proportion to their allocable share of taxable income as determined under the Tax Appendix for such calendar year with such amount treated as payment on amounts otherwise payable under Paragraph 7.1 in the order they would otherwise have been distributed and shall be credited against amounts otherwise payable under those Sections.

7.3 **Distribution of Liquidation Proceeds.** Liquidation Proceeds shall be distributed in accordance with Section 14.2.

## 8. TAX PROVISIONS.

8.1 **Allocation of Net Profit and Net Loss.** For federal income tax purposes, Net Profit or Net Loss for each fiscal year shall be allocated to the Members in proportion to their respective Membership Interests, except as provided in Paragraph 8.2.

8.2 **Section 704(c) Allocation.** Notwithstanding Paragraph 8.2, any income, gain, loss, and deduction(s) recognized by the Company for income tax purposes in any fiscal year that is required to be allocated among the Members in accordance with section 704(c) of the Code shall be allocated to the Members for income tax purposes in the manner so required.

8.3 **Special Allocations.** Items of income, gain, loss and deduction shall be allocated in accordance with the provisions of this Paragraph 8.3 without regard to the allocation provision contained in Paragraph 8.2, in the following order:

8.3.1 Qualified Income Offset. If any Member's Capital Account is unexpectedly adjusted for, or such Member is unexpectedly allocated or there is unexpectedly distributed to such Member, any item described in Treas. Reg. Section 1.704-1 (b) (2) (ii) (d) (4)-(6), and such treatment creates or increases a Member's adjusted capital account deficit, then without regard to the allocations provided in Paragraph 8.2, the Company shall allocate to such Member items of Company income and gain (consisting or a pro rata portion of each item of Company income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such adjusted capital account deficit as quickly as possible.

8.3.2 Gross Income Allocation. In the event that a Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount the Member is obligated to restore pursuant to any provision of this Operating Agreement, and (ii) the amount the Member is deemed to be obligated to restore pursuant to Treas. Reg. Section 1.704-2 (g) and (i) (5), the Member shall be specially allocated items of Company income and gain the amount of such excess as quickly as possible, provided that an allocation pursuant to this

paragraph shall be made if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Paragraph 8.3 have been tentatively made as if this Paragraph 8.3 (b) were not in this Operating Agreement.

8.4 **Tax Matters.** All tax returns of the Company shall be prepared under the direction of the Members pursuant to Paragraph 9.2 herein. The Members, pursuant to Paragraph 9.2 herein, shall have the right to make any and all elections available under applicable tax laws. Rodney G. Davis is hereby designated as the "Tax Matters Partner" for the Company (as such term is defined in Section 623 (a) (7) of the Code).

9. MANAGEMENT.

   9.1 **Member Managed.** Responsibility for managing the operations of the company shall reside in the Members pursuant to Paragraph 9.2 herein and in accordance with the Act and they shall have the sole and exclusive authority to manage the business of the Company including, without limitation, the following rights, each of which may be exercised in such manner and upon such terms and conditions as the Members, in their judgment, and pursuant to Paragraph 9.2 herein determine to be in the best interests of the Company:

   9.1.1 to acquire real, personal, tangible and intangible property for the operation of the Company's business;

   9.1.2 to sell or otherwise dispose of the Company property;

   9.1.3 to borrow money to finance the Company's activities and to pledge, mortgage, grant security interests in or otherwise encumber Company property to secure the repayment of such loans;

   9.1.4 to employ, retain or otherwise secure the services of any employees, attorneys, accountants, advisers and others deemed necessary by the Members to facilitate the conduct of the Company's business;

   9.1.5 to develop property in any way that the Members deem appropriate; and,

   9.1.6 to take any and all other action that is permitted by law and customary in or reasonably related to the conduct of the Company's business or affairs.

   9.2 **Vote Required.** All actions which are to be taken by the Members shall require the affirmative vote of a majority interest of all Members including the following:

   (a) Any requirement of additional capital contributions;

   (b) The purchase of any Member's Membership Interest;

   (c) Any amendment of the Articles of Organization or this Operating Agreement;

Unanimous vote of the members shall be required for the following actions:

(d) The Admission of new members, and

(e) The sale of substantially all of the assets of the Company;

9.3 **Officers.** Christopher Russo and Rodney G. Davis, jointly and severally, shall be the operations managers and the financial operations manager, respectively, and shall be responsible for the day to day operations of the Company and authorized to make any and all decisions customary and reasonable for furtherance of same with the exception of those decisions set out in Paragraph 9.2 which shall be subject to the vote of all Members. If the event of the death or disability of either Christopher Russo or Rodney G. Davis it is agreed that the other shall immediately assume both management roles pending the admittance of their heir at law as a member. The appointment of the operations managers may be modified by a unanimous vote of the Members.

9.3.1 It is agreed that Christopher Russo, Rodney G. Davis, Scott Krone and James Lehmann shall be signatories on the company bank accounts at JP Morgan Chase, N.A. and Scott Krone and James Lehman shall have authority to make all transaction up to $5,000.00 in the day to day management of the storage facility; however, any transactions exceeding $5,000.00 shall be agreed to by Christopher Russo and Rodney G. Davis.

9.3.2 One Stop Self Storage shall manage the day to day operations of the storage facility through Scott Krone and James Lehman. All daily financial transactions shall be made in the company operating account at JP Morgan Chase, NA and the company shall maintain an additional financial management account at JP Morgan Chase, NA for the payment of the mortgage, notes and other financial commitments of the company. All members shall have full access to the daily financial transactions of the company.

9.3.3 For any action herein requiring a vote of the members said vote may be taken by electronic, digital or facsimile vote. A copy of said vote shall be retained in the books of the company and a copy or electronic signature of the Member's signature shall be deemed an original for purposes herein.

## 10. INSURANCE INDEMIFICATIONS.

10.1 **Insurance.** The Members shall cause the Company to obtain and maintain comprehensive general and product liability insurance, casualty insurance covering the Company's insurable property and insurance covering such other risks as are normally insured in comparable businesses as the Members determine, pursuant to Paragraph 9.2 herein to be appropriate to protect the interest of the Company.

10.2 **Limited Liability.** No Member or Officer of the company shall be liable, responsible or accountable in damages or otherwise to the company or any Member for any action taken on behalf of the Company within the scope of authority of such Member or such

6

officer, or reasonably believed by such person to be within the scope of his authority, or for any omission.

10.3 **Indemnification.** The Company shall reimburse, indemnify, defend and hold harmless the Members and each officer from and against any loss, expense, damage or injury suffered or sustained by the Company or the Members by reason of any acts or omissions arising out of such person's activities on behalf of the Company or in furtherance of the interests of the Company, including, without limitation, any judgment, award, settlement reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, but excluding loss, expense, damage or injury caused by or resulting from any acts or omissions performed or omitted fraudulently or in bad faith or which constitute gross negligence or warrant and willful misconduct.

10.4 **Key Personnel Insurance.** The Members may cause the Company to obtain and maintain Key Personnel Insurance on Christopher Russo and Rodney G. Davis, or such other personnel or individual as deemed necessary by the operations managers.

11. **BANKING.** The funds of the Company shall be kept in a separate account or accounts in the name of the Company. All withdrawals from any such bank accounts or investments shall be made on the signature of one of the Members.

12. **ACCOUNTING.** The fiscal year of the Company shall be the calendar year. The Company shall keep its books in accordance with the cash method of accounting pursuant to generally accepted accounting principles. The Company's books of account and records shall be maintained at the Company's principal. Any Member shall have the right to inspect and make copies of the Company's books and records at such Member's sole cost and expense. The members shall have the right to review all financial accounts at any financial institution by means of on-line access; however, no member shall be permitted to use on-line access to conduct any financial transaction or transfers on behalf of the company.

13. **RESTRICTIONS ON TRANSFERS OF MEMBERSHIP INTEREST.**

    13.1 Voluntary Transfer. If a Member intends to transfer any Membership Interest he owns to any person other than the Company, he shall give written notice to the Company and to any non-selling Member(s) ("Remaining Member(s)") of his intention to transfer his Membership Interest. Said written notice shall state: (i) the percentage of his Membership Interest he desires to transfer; (ii) the name, business and residence address of the proposed transferee; and (iii) whether or not the transfer is made at arm's length for full and valuable consideration, and if so, the amount of the consideration and the other terms of the sale. For sixty (60) days following the Company's receipt of the Transfer Notice (the "Company Option Period"), the company shall have the option to purchase all or any portion of the Membership Interests which are proposed to be transferred, for the price and upon the terms set forth in Paragraph 13.9, and if the Company does not exercise its option to purchase all, but not less than all, of such Membership Interest within said sixty (60) day period, the Remaining members for a

period of fifteen (15) days after the expiration of the Company Option Period shall have an option to purchase all of the Membership Interests which have not been purchased by the Company, at the price and upon the terms set forth in Paragraph 13.9 in proportion to their Membership Interests.

Notwithstanding the above, any Member may transfer his membership Interest solely for estate planning purposes to a trust or family members provided that the Member retains control over the Membership Interest

13.2 Involuntary Transfers. In the event of the death, incompetency, bankruptcy, withdrawal or dissolution of a Member (a "Withdrawing Member"), (i) for a period of ninety (90) days after the Company receives actual notice thereof, the Company shall have the option to purchase all or any portion of the Withdrawing Member's Interest, for the price and upon the terms set forth in Paragraph 13.9(a). If the Company does not exercise its option to purchase all of the Withdrawing Member's Interest, for a period ending fifteen (15) days after the close of the company's ninety (90) day option period, the Remaining Members, in proportion to their Membership Interests, shall have an option to purchase all, but not less than all, of such Withdrawing Member's Interest at the price set forth in Paragraph 13.9(a) and upon the same terms as provided for herein regarding a voluntary transfer in Paragraph 13.1 of this Operating Agreement. Notwithstanding the foregoing, neither the Company nor the Remaining Members may exercise their options, the provisions of Paragraphs 13.3 and 13.7 shall apply to the Withdrawing Member and his/her representative, if any.

13.3 Exercise of Options.

13.3.1 Means of Exercise. The Company and the Remaining Members who exercise any option granted by this Section 13 shall do so by giving written notice ("Exercise Notice") of the exercise of their respective options within the time periods provided in this Section 13 to the Members and, in the case of an option upon involuntary transfer, to the Withdrawing Member's representative.

13.3.2 Voting to Exercise. A transferor, in his/her capacity as a Member, shall not be entitled to vote in the company's determination of whether to exercise any purchase option granted by this Operating Agreement or with respect to any decisions or actions involving the purchase option or the consummation of the exercise thereof.

13.4 Nonexercise of Options. If the Remaining Members and the Company fail to exercise their purchase options to acquire all of the Membership Interests which are proposed to be transferred in compliance with Paragraph 13.1 of this Operating Agreement, the transferor may, within thirty (30) days following the expiration of the option period for

8

the Remaining Members, transfer the Membership Interest to the transferee named in the Transfer Notice, subject to the terms of this Operating Agreement; provided, however, that such transfer must be made upon the terms and for the considerations specified in said Transfer Notice. If the transfer is not made upon the terms or is not to the transferee stated in the Transfer Notice, or if the transfer is not made with said thirty (30) day period, or if the transferor, after the transfer, reacquires all or any portion of the transferred membership Interests, the initial transfer shall be void and without legal or other effect.

13.5 Requirements for Transfer. Subject to any restrictions on transferability required by law (including the Securities Act of 1933, any state securities or "Blue Sky: law, and the rules promulgated there under), and subject to the provisions of Paragraphs 13.1, 13.3 and 13.7 which shall have priority, each Member shall have the right to transfer (but not to substitute the assignee as a substitute Member in his place, except in accordance with Paragraph 13.7 hereof), by a written instrument, the whole or any part of his Membership Interest, provided that: (i) the transferee is a citizen and resident of the United States, and otherwise not a tax-exempt entity under Section 168 (h) of the Code; (ii) the transferor delivers to the Company and the Remaining Members that neither the transfer nor any offering in connection therewith violates any provision of any federal or state securities law; (iii) the transferee executes a statement that he is acquiring such Membership Interest or such part thereof for his own account for investment and not with a view to distribution, fractionalization or resale thereof; and (iv) the Company receives a favorable opinion of the Company's legal counsel or such other counsel selected by the remaining Members that such transfer would not result in the termination of the Company (within the meaning of Section 708 (b) of the Code) or the termination of its status as a partnership under the code; provided, further, that the Remaining Members may elect to waive the requirement of the opinions of counsel set forth in Paragraphs 13.5 (ii) and (iv) above should each of them, in their sole discretion, determine that the cost or time delays involved in procuring such opinions may impede the company's ability to effect the contemplated transfer.

13.6 Effectiveness of Assignment. No transfer shall be effective unless and until the requirements of Paragraph 13.7 are satisfied. The transfer by a Member of all or part of his Membership Interest shall become effective on the first day of the calendar month immediately succeeding the month in which all of the requirements of this Paragraph 13 have been met, and the company has received from the transferor a transfer fee sufficient to cover all expenses of the Company connected with such transfer; provided, however, that the Remaining members may elect to waive this fee in their sole discretion. All distributions made thereafter in respect of the Membership Interest of the transferor shall be made to the transferee of such transferor's Membership Interest.

13.7 **Requirement for Admission.** No transferee of the whole or a portion of a Member's Interest shall have the right to become a Member unless and until all of the following conditions are satisfied:

(a) A duly executed and acknowledged written instrument of transfer approved by the Remaining Members has been filed with the Company setting forth (i) the intention of the transferee to be admitted as a Member; (ii) the notice address of the transferee; and (iii) the percentage of Membership Interests transferred by the transferor to the transferee;

(b) The opinions of counsel described in Paragraph 13.5 above are delivered to the Company and the Remaining Members, subject to the Remaining Members' right to waive the delivery of these opinions in their sole discretion.

(c) The transferor and transferee execute and acknowledge, and cause such other persons to execute and acknowledge, such other instruments and provide such other evidence as the Remaining members may reasonably deem necessary or desirable to effect such admission, including without limitation: (i) the written acceptance and adoption by the transferee of the provisions of this Operating Agreement including a representation and warranty that the representations and warranties in Paragraph 17.2 are true and correct with respect to the transferee; (ii) the transferee's completion of a purchaser qualification questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law; and (iii) the transferee's completion, if applicable, of an acknowledgment of the use of a purchaser representative, and such representative's completion of a purchaser representative questionnaire which will enable counsel for the Company to determine whether such proposed substitution is consistent with the requirements of a private placement exemption from registration under the Securities Act of 1933 and relevant state law;

(d) The admission is approved by the Remaining members, the granting or denial of which shall be within the sole and absolute discretion of the Remaining Members; and

(e) A transfer fee has been paid to the Company by the transferor sufficient to cover all expenses in connection with the transfer and admission, including but not limited to attorney's fees for the legal opinions referred to in Paragraphs 13.5 and 13.7, subject to the Remaining Members' right to waive the payment of this fee in their sole discretion.

13.8 **Rights of Mere Assignees.** If a transferee of a Membership Interest is not admitted as a Member, he shall be entitled to receive the allocations and distributions attributable to transferred Membership Interest, but he shall not be entitled to inspect the Company's

books and records, receive an accounting of the Company's financial affairs, exercise the voting rights of a member, or otherwise take part in the Company's business or exercise the rights of a Member under this Operating Agreement.

13.9 Purchase Price and Terms.

    (a) Purchase Price. If the Company or the Remaining Members exercises its or their option (the "Optionor"), the purchase price which the Optionor shall pay for the transferor's Membership Interest following the exercise of an option to purchase under Paragraph 13.1 or 13.2 shall be an amount equal to: (1) the purchase price as stated in the Transfer Notice where (a) the proposed transfer is for full and adequate consideration and (b) the transferee identified in the Transfer Notice is not a member of the transferor's family or an affiliate of the transferor; and (2) in all other cases, the value of the transferor's Membership Interest as mutually agreed upon by the Members. If the parties cannot agree within ten (10) days after the date of the final Exercise Notice, the purchase price shall be the amount which the transferor would receive if all the Company property were sold at is appraised fair market value and the proceeds were applied in accordance with Paragraph 14.2. An independent appraiser ("Qualified Appraiser") experienced in conducting appraisals of assets similar to the Company property shall conduct an appraisal of all the company property to determine its fair market value ("First Appraisal"). The Optionor shall select and pay for a Qualified Appraiser to perform the First Appraisal. If, with five (5) days after receipt of the First Appraisal, the parties cannot agree, the transferor may obtain, at his own cost, a second appraisal ("Second Appraisal") of the fair market value of the Company property by a Qualified Appraiser of his choice. If the parties agree, the Second Appraisal shall be used to determine the value of the Company property. If the two appraisals are performed and the parties cannot agree within ten (10) days after receipt of the second appraisal which of the appraisals accurately reflects the value of the company property, then the two appraisers selected under this subparagraph shall select a Qualified Appraiser to conduct a third appraisal ("Third Appraisal") of the fair market value of the Company property. The fair market value of the Company property established by the Third Appraisal shall be final and binding in all respects on all parties. The Optionor and the transferor shall each pay fifty (50%) percent of the costs of the Third Appraisal.

    (b) Payment of Purchase price and Closing. The closing of any sale and purchase of the transferor's Membership Interest in the Company shall be within thirty (30) days from the later of (1) the date of the final Exercise Notice; or (2) delivery of the final appraisal performed pursuant to Paragraph 13.9(a). The Optionor shall pay the purchase price: (1) at the time in accordance with the terms and conditions as stated in the Transfer Notice, where the purchase price is determined pursuant to Paragraph 13.9(a); or (2) at the closing in all other cases, unless the parties agree on different terms. The transferor shall deliver documents satisfactory to the Optionor conveying his Membership Interest free and clear of all liens, claims and encumbrances, any of which may be paid out of the purchase price, with the remainder, if any, paid to the

transferor. If the purchase price is insufficient to satisfy any such liens, the transferor shall discharge the balance.

13.10   LIFE INSURANCE: It is understood that from time to time the company may maintain life insurance on company personnel including the managers.

## 14. TERMINATION OF COMPANY.

14.1 **Termination Events.** The Company shall be liquidated and dissolved and its affairs shall be wound up upon the first to occur of any of the following (each a "Termination Event"):

14.1.1  The sale of all or substantially all of the Company's assets;
14.1.2  The agreement of all members to dissolve the Company;

14.1.3  The entry of a final and non-appealable decree of judicial dissolution under Section 1705.48 of the Act; and

14.1.4  The death, insanity, bankruptcy, retirement, resignation or expulsion of Member, unless the business of the Company is continued by consent of a majority of remaining Members.

14.2 **Winding Up.** Upon the occurrence of a Termination Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Members in accordance with the Act. No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. The Members shall be responsible for overseeing the winding up and dissolution of the Company and shall take full account of the Company's assets and liabilities, and the Company's assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefore, shall be applied and distributed in the following order:

14.2.1  First, to the payment and discharge of all company liabilities to creditors other than Members;

14.2.2  Second, to the establishment of any reserves reasonably deemed necessary by the Members for any contingent liabilities of the Company. Any such reserves

    shall be deposited in an escrow account in the name of the Company for the purpose of (i) paying any such contingent liabilities, and (ii) at the expiration of such period deemed advisable by the Members, distributing the balance of such reserves in the manner hereinafter provided;

    14.2.3  Third, to the payment and discharge of all loans by and net company liabilities to members and in the event that more than one Member has made a loan to the Company, each Member shall be repaid in proportion to the amounts of the loans. For example, if Member A has loaned $100,000.00 and Member B has loaned $50,000.00 and there is only $12,000.00 to distribute, Member A will receive $8,000.00 and Member B will receive $4,000.00; and

    14.2.4  The balance, if any, to the Members in accordance with their percentage ownership set forth in Exhibit "A" attached hereto.

14.3  **Date of Termination.** The Company's existence shall continue until its assets have been distributed in accordance with Paragraph 14.2, and its existence shall terminate when a Certificate of Dissolution has been filed with the Secretary in accordance with the Act. The establishment of any reserves pursuant to Paragraph 14.2.2 shall not extend the Company's existence, but any such reserves shall be distributed in the manner provided in Section 14.2 when the obligations or liabilities for which such reserves were established have been satisfied or otherwise disposed of.

15. **OTHER ACTIVITIES.** Each member may own or engage or invest in any other business venture or activity independent of the Company without any obligation to offer any interest or the right to participate therein to the company or the other Members.

16. **ARBITRATION.**

    16.1  **Controversies.** Any controversy between the Members relating to this Agreement or the transactions contemplated hereby shall be submitted to arbitration in Columbus, Ohio, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect.

    16.2  **Arbitrator's Decision.** The decision of the arbitrator(s) and any award pursuant thereto shall be final, binding and conclusive evidence on the parties and shall be non-appealable. final judgment on such decision and any award may be entered by any court of competent jurisdiction.

    16.3  **Costs.** The arbitrator(s) may award the costs of the arbitration proceeding including, without limitation, reasonable attorneys' fees, arbitrators' fees and out-of-pocket expenses incurred in connection with the arbitration hearing and prehearing proceedings between the parties in such manner as the arbitrator(s) may determine to be reasonable and equitable in light of the outcome of the arbitration proceeding.

17. **GENERAL PROVISIONS.**

17.1 **Liability of Members.** Except as otherwise provided under the Act, (a) the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and (b) none of the Members or officers shall be personally liable for any judgment, decree, or order of a court, or in any other manner for any debt, obligation, or liability of, the Company solely by reason for being a Member or officer.

17.2 **Representations and Warranties.** Each Member hereby represents and warrants to the Company and other Members that he/she is acquiring its interest in the Company for his/her own account as an investment and without an intent to distribute the same. Each Member acknowledges that the Membership Interests have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirement.

17.3 **No Partnership Intended for Non-Tax Purposes.** The Members have informed the Company under the Act, and expressly do not form a partnership under the Ohio Uniform Partnership Act (Ohio Revised Code Chapter 1782). The Members do not intend to be partners with one another, or partners as to any third party. To the extent any Member represents to another person in any manner that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to the Company and to such other Members for any loss, damage or liability caused by such wrongful representation.

17.4 **Amendments.** This Agreement may be amended only by written approval of all of the Members.

17.5 **Severability.** Every provision of this Agreement is severable. If any term or provision hereof is illegal, invalid or unenforceable for any reason, such illegality, invalidity or unenforceability shall not affect the validity, legality or enforceability of the remainder of this Agreement.

17.6 **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio.

17.7 **Binding Effect.** This agreement shall be binding upon and inure to the benefit of the Members and their respective successors and assigns.

17.8 **Captions.** The captions contained in this Agreement are for reference purposes only and are not intended and shall not be deemed to describe, interpret, define or limit the scope, extent or intent of this agreement or any provision hereof

17.9 **Notices.** Any notices required herein shall be sent by certified mail, return receipt requested, to the Members at the address set forth on Exhibit A.

17.10 **Multiple Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been executed by the Members of the date first above written.

**MEMBERS:**

**RCK INVESTMENTS, LLC**

_____
Christopher Russo

_____
Rodney Davis

**CODA HOLDING-V, LLC**

_____
SCOTT KRONE

_____
JAMES LEHMANN

16

**EXHIBIT A**

**JOURNAL STORAGE, LLC UNIT BREAKDOWN**

| Current | Units Owned | Distribution %* |
|---|---|---|
| RCK INVESTMENTS, LLC | ~~50~~ 81 JL | ~~50~~ 81 JL |
| CODA HOLDING-V, LLC | ~~50~~ 19 | ~~50~~ 19 |
| | CM | L CM |
| | 100 | 100.00 |

17